**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



_____
Mary Ann Whipple
United States Bankruptcy Judge

**Dated: March 19 2012**

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No.: 08-35508 |
| | ) | |
| GOE Lima, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Adv. Pro. No.  09-3204 |
| | ) | |
| GOE Lima, LLC, | ) | Hon. Mary Ann Whipple |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| Ohio Farmers Insurance Company, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OF DECISION AND ORDER
## GRANTING MOTION TO INTERVENE

This adversary proceeding is before the court on a Motion to Intervene as an Interested Party filed by PEA (LIT), LLC ("PEA") [Doc. # 60], and Defendant Ohio Farmers Insurance Company's ("OFIC") opposition [Doc. # 67]. The court held a hearing on the motion at which attorneys for PEA and OFIC attended in person.  An attorney for the Liquidating Trustee under Plaintiff GOE Lima, LLC's confirmed Chapter 11 plan attended by telephone.  Having considered the parties' briefs and the arguments of counsel, for the reasons that follow, PEA's motion will be granted.

## BACKGROUND

The circumstances forming the basis of the complaint in this proceeding revolve around a contractual dispute between GOE Lima, LLC ("GOE"), the debtor in the underlying Chapter 11 case, and Smith-Boughan, Inc. ("Smith-Boughan"). GOE entered into a contract with Smith-Boughan for Smith-Boughan to provide certain mechanical services in connection with the construction of an ethanol facility on GOE's property in Lima, Ohio ("Construction Contract"). [*See* Doc. # 1, Complaint & attached Ex. A]. The Construction Contract incorporates by reference an agreement captioned "General Conditions of the Contract for Construction ("General Conditions"). [*Id.,* attached Ex. B]. The General Conditions include certain provisions relating to mediation and arbitration of claims arising out of the Contract. [*See id.* at § 4.6]. The General Conditions also include a provision that GOE "may pursuant to the terms of a security agreement . . . assign, mortgage or pledge all or any of its rights, interests and benefits under this Agreement to the Financing Parties. . . ." [*Id.* at § 13.2.1].

As required under the General Conditions, a Performance Bond was issued by OFIC, as surety, and Smith-Boughan, Inc. ("Smith-Boughan"), as principal, for the benefit of GOE, referred to in the bond as "Owner." [*See id.*, attached Ex. C]. The Performance Bond incorporates by reference the Construction Contract. [*Id.* at ¶ 1]. Pursuant to the terms of the bond, in the event of a default in performance by Smith-Boughan under the Construction Contract and after certain conditions precedent are satisfied by GOE, OFIC was required to either complete the Construction Contract itself, arrange for its completion and pay GOE damages specified in paragraph six of the bond, or waive its right to do either of the foregoing, determine its liability and tender payment to GOE as soon as practicable. [*Id.* at ¶ 4]. The Performance Bond further provides that "[n]o right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators or successors." [*Id.* at ¶ 7].

Smith-Boughan had commenced a separate adversary proceeding against GOE on January 30, 2009, alleging, among other things, that GOE breached and wrongfully terminated the Construction Contract. [Adv. Pro. No. 09-3020, Doc. # 1]. In its answer, GOE asserted a counterclaim for breach of contract. [*Id.*, Doc. # 22]. On September 1, 2009, that proceeding was stayed pending the completion of arbitration proceedings between GOE and Smith-Boughan. [*Id.*, Doc. ## 39, 54 & 60].

GOE commenced this adversary proceeding on August 28, 2009. In its complaint, it seeks judgment for damages in an amount in excess of $15 million under the Performance Bond. GOE alleges that Smith-Boughan breached the Construction Contract and that OFIC, as surety under the Performance Bond, despite being notified of Smith-Boughan's breaches, failed to take any action to remedy the breaches. [*Id.*, Complaint, ¶¶ 9-10]. GOE alleges that it then terminated the Construction Contract and engaged other

2

contractors to complete Smith-Boughan's work. [*Id.* at ¶¶ 12-13]. It further alleges that it satisfied all conditions precedent to its right to enforce the Construction Contract against Smith-Boughan and the Performance Bond against OFIC. [*Id.* at ¶ 15]. OFIC filed an answer and third-party complaint against Smith-Boughan for indemnification on September 30, 2009. On October 12, 2009, the parties in this proceeding filed a Stipulation, agreeing that this proceeding should be stayed pending completion of arbitration proceedings between GOE and Smith-Boughan on the claims asserted in Adv. Pro. No. 09-3020 or further order of this court, [Doc. # 12], and the court entered an order to that effect on October 13, 2009, [Doc. # 14].

On May 5, 2010, the court entered an order in GOE's underlying Chapter 11 case approving, as modified in that order, a Settlement Agreement between, among others, PEA and GOE. [Case No. 08-35508, Doc. # 653]. The Settlement Agreement, as modified, was attached to and incorporated by reference into GOE's First Amended Joint Plan of Liquidation ("Plan"), which was confirmed on July 8, 2010. [*Id.*, Doc. # 612]. The Plan and Settlement Agreement provide that GOE and the Liquidating Trust, created pursuant to the Plan, are deemed to have assigned to PEA on the Settlement Agreement effective date all of their rights, title and interest in the "Construction Claims," which include GOE's counterclaim against Smith-Boughan in Adv. Pro. No. 09-3020, as well as its claim against OFIC in this proceeding. [*See id.*, Doc. 612, Plan ¶ 7.8(a) and (b), and attached Ex. 2, Settlement Agreement, p. 5, ¶¶ 4 & 5]. The Settlement Agreement effective date was September 16, 2010, which was also the effective date of the Plan. [*See id.*, Ex. 2, p. 4, ¶ 3; Doc. # 739]. OFIC is not a creditor in GOE's Chapter 11 case, was not served notice of, and did not participate in, any of the hearings relating to approval of the Settlement Agreement or confirmation of the Plan in the Chapter 11 bankruptcy case.

Notwithstanding the court's September and October 2009 orders staying the proceeding in Adv. Pro. No. 09-3020 pending arbitration, neither GOE nor Smith-Boughan took any action to commence the arbitration contemplated in those orders. It was not until October 22, 2010, that an arbitration proceeding was commenced, but by PEA, not GOE. Although PEA attempted to join OFIC as a party in the arbitration proceeding, the American Arbitration Association determined that PEA had not met "the minimum filing requirements" with respect to OFIC and removed it from the proceeding. [*See* Doc. # 49, Ex. 1].

On October 18, 2010, before the arbitration proceeding was commenced, OFIC filed a motion seeking relief from the court's order staying this proceeding for the limited purpose of filing, and the court deciding, a motion for summary judgment based upon its contention that GOE failed to perform conditions precedent to any obligation of OFIC under the Performance Bond. Plaintiff GOE did not respond to the

motion, nor has it participated in, or appeared at hearings held since the motion was filed. However, PEA filed a response to OFIC's motion. In its reply brief filed on November 15, 2010, OFIC raised the issue of PEA's lack of standing and failure to file a motion to intervene. These issues were again raised in OFIC's response to a motion for leave to file supplemental authority filed by PEA on February 2, 2011, and in a status report regarding arbitration filed on August 24, 2011. PEA filed the instant Motion to Intervene as an Interested Party on October 17, 2011.

## LAW AND ANALYSIS

PEA seeks to intervene of right pursuant to Fed. R. Civ. P. 24(a)(2). Under *Blount-Hill v. Ohio*, 636 F.3d 278, 283 (6th Cir. 2011), an applicant must show that: (1) the application was timely filed; (2) the applicant possesses a substantial legal interest in the case; (3) the applicant's ability to protect its interest will be impaired without intervention; and (4) the existing parties will not adequately represent the applicant's interest. OFIC argues that PEA's motion was not timely filed and that it possesses no interest relating to the property or transaction that is the subject of this proceeding because the assignment by which it claims an interest was not valid. For the reasons that follow, the court disagrees.

**I. PEA's Motion to Intervene was Timely Filed**

In *Blount-Hill*, the court set forth five factors to weigh in determining the timeliness of an application for intervention of right: (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenor knew or should have known of its interest in the case; (4) the prejudice to the original parties due to the proposed intervenor's failure to promptly intervene after it knew or reasonably should have known of its interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention. *Id.* at 284. However, no single factor is determinative. *Id.*

As to the first factor, this proceeding has not progressed beyond OFIC answering the complaint as it was stayed pending arbitration of claims in Adv. Pro. No. 09-3020 just two weeks later. No scheduling orders have been entered. The court does not find the filing of OFIC's Motion for Relief from Abeyance Order together with the briefing in support and in opposition thereof, OFIC's status hearing update regarding the arbitration proceeding, and its motion to strike PEA's filings to be significant progress in this lawsuit as argued by OFIC. *Cf. Lyndon Prop. Ins. Co. v. Katz*, 196 Fed. Appx. 383, 388 (6th Cir. 2006) (motion to intervene untimely where there had been cross-motions for summary judgment, an approved settlement, a reversal, and a remand before motion to intervene was filed). Given the still early stage of this proceeding due to it being stayed, this factor weighs in favor of a finding that PEA's motion is timely.

4

The second factor requires the court to consider the purpose for which intervention is sought. PEA seeks to protect its interest in GOE's claim against OFIC, which is the subject of this lawsuit and which was assigned to it pursuant to the Settlement Agreement and Chapter 11 Plan. OFIC has requested leave to file a motion for summary judgment, which, if granted, would extinguish that claim. Thus, this factor also weighs in favor of finding the motion timely.

According to OFIC, the third factor alone provides a basis for denying PEA's motion to intervene because PEA waited to file the motion for more than a year after the Plan became effective and eleven months after OFIC raised the issue of PEA's lack of standing in its reply brief in support of its Motion for Relief from Abeyance Order. OFIC cites *Blount-Hill* and *Stotts v. Memphis Fire Department*, 679 F.2d 579 (6th Cir. 1982), for the proposition that a proposed intervenor's failure to seek to intervene promptly after discovering its interest in the case weighs heavily against a timeliness determination. However, in both of those cases, the proposed intervenor had adopted a "wait-and-see approach" that the court found objectionable. In *Blount-Hill*, the proposed intervenors knew that their interest in the case could be affected by an upcoming statewide election and waited until after the election to act. *Blount-Hill*, 636 F.3d at 285-86. Similarly, in *Stotts*, non-minority proposed intervenors had knowledge of a lawsuit that challenged a fire department's promotion procedure as racially discriminatory but waited until after a consent decree was entered that affected those procedures. *Stotts*, 679 F.2d at 583-84.

Unlike *Blount-Hill* and *Stotts*, PEA did not employ a "wait-and-see" approach. There was no reason to seek intervention after the Plan became effective and before OFIC's Motion for Relief from Abeyance Order was filed since this proceeding was stayed. And although PEA's responses to OFIC's motion and status hearing updates were procedurally improper, it did file responses and did not simply wait to see how the court would rule. While the court agrees that PEA should have sought intervention before filing its responses, the court does not find this factor to weigh strongly against a timeliness determination.

The fourth factor requires the court to consider any prejudice caused to OFIC by PEA not seeking intervention at an earlier date. According to OFIC, if PEA had intervened after OFIC's Motion for Relief from Abeyance Order was filed, the court could have determined at that time whether PEA has standing to intervene and whether the assignment by which it claims an interest in this case is valid. OFIC would not have had to incur the cost of filings in this proceeding and in defending itself in what OFIC characterizes as an improper arbitration proceeding. With respect to the cost of defending itself in the arbitration proceeding, the court notes that OFIC was dismissed from that proceeding apparently before any substantive issues were addressed due to PEA's failure to meet the minimum filing requirements. In any event, OFIC's

5

contention that it has incurred costs in this proceeding and in the arbitration proceeding that would not have been incurred if the court had ruled at an earlier date regarding the validity of the assignment by which PEA claims an interest in the subject matter of this proceeding is based on OFIC's argument that the assignment was not valid. However, as discussed more fully below, the court concludes that PEA does have a valid interest in the subject matter of this proceeding. It is nevertheless true that OFIC would not have had to incur the additional cost to argue that PEA lacked standing due to its failure to employ the proper procedural tools to be heard in this proceeding if it had sought intervention at an earlier date. While this weighs against a timeliness determination, the court does not find it to be a strong factor. *Cf. Lyndon Property Ins. Co.*, 196 Fed. Appx. at 388 (finding motion to intervene was untimely where intervention would have destroyed settlement of claims in proceeding).

For the foregoing reasons, in weighing these factors, the court concludes that PEA's motion to intervene was timely filed.

## II. PEA Has A Substantial Legal Interest in the Subject Matter of this Proceeding

PEA must show that it has a legal interest in the subject matter of this proceeding. The United States Supreme Court has stated that the interest that is required is a "significantly protectable interest." *Donaldson v. United States*, 400 U.S. 517, 532 (1971). The Sixth Circuit further describes the required interest as an interest that is direct and substantial. *Purnell v. City of Akron*, 925 F.2d 941, 947 (6th Cir. 1991).

PEA claims an interest in this litigation as the assignee of GOE's claim against OFIC that is the subject of this adversary proceeding. If the assignment of the claim is valid, PEA clearly has a direct and substantial interest to support intervention under Rule 24(a). OFIC argues that PEA has no interest in the subject matter of this proceeding for two reasons: (1) pursuant to paragraph 7 of the Performance Bond, a right of action against OFIC cannot be assigned, and (2) the assignment provision of the Construction Contract limits assignment to GOE's Lenders or Collateral Agents, also referred to as the "Financing Parties." Thus, OFIC argues that the assignment to PEA of the Construction Claims, which include both GOE's claim against Smith-Boughan and its claim against OFIC, was improper and is not valid. PEA responds that those arguments are barred as a collateral attack on the court's order confirming GOE's Chapter 11 Plan, which incorporates the Settlement Agreement and provides for the assignment. While the court finds no merit in PEA's res judicata argument, it nevertheless finds that the assignment of the Construction Claims is valid.

6

## A. Res Judicata

Under the doctrine of res judicata, a party is precluded from bringing a claim if each of the following elements are present:

> (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their 'privies[';] (3) an issue in the subsequent action which was litigated or should have been litigated in the prior action; and (4) an identity of the causes of action.

*Winget v. JP Morgan Chase Bank, N.A.*, 537 F.3d 565, 577-78 (6th Cir. 2008) (quoting *Browning v. Levy*, 283 F.3d 761, 771 (6th Cir. 2002)).

In this case, PEA cannot satisfy the second element. OFIC is not a creditor in GOE's Chapter 11 case, and was not served notice of, and did not participate in, any of the hearings relating to approval of the Settlement Agreement or confirmation of the Plan in the bankruptcy case. Thus, PEA cannot show that OFIC was a party in the bankruptcy case proceedings. Nor was OFIC in privity with any party to those proceedings. "Privity in this sense means a successor in interest to the party, one who controlled the earlier action, or one whose interests were adequately represented [by a party]." *Sanders Confectionery Prod., Inc. v. Heller Fin'l, Inc.*, 973 F.2d 474, 481 (6th Cir. 1992). OFIC is not a successor in interest to any party, nor did it control the litigation, in the earlier proceedings. And the interests of OFIC were not represented by any party to those proceedings. Consequently, OFIC's attack on the validity of the assignments at issue is not barred under the doctrine of res judicata.

## B. The Assignment of the Construction Claims is Valid

### 1. Claims Under the Performance Bond

OFIC argues that the following language in paragraph 7 of the Performance Bond precludes assignment of GOE's claim against it: "No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators, or successors." The interpretation of contracts is a matter of state law. *Telxon Corp. v. Fed. Ins. Co.*, 309 F.3d 386, 391 (6th Cir. 2002). "Where a federal court is deciding an issue of state law that has not been decided by the state's highest court, the federal court should determine how the state's highest court would decide the issue were it faced with it." *Pack v. Damon Corp.*, 434 F.3d 810, 818 (6th Cir. 2006). "The federal court should heed the decisions of the intermediate appellate state courts except where the federal court is persuaded that the highest court of the state would not so decide." *Id.* In this case, the Construction Contract, which the performance bond incorporates by reference, provides that it shall be governed by the laws of Ohio. [Doc. # 1, Ex. A, ¶ 13.1.1].

The court has found only one Ohio case interpreting similar language in a performance bond, but

7

in a context other than the assignment of a right of action under the bond.  *See Fred B. DeBra Co. v. U.S. Fidelity & Guaranty Co.*, No. C-850635, 1986 WL 7854, 1986 Ohio App. LEXIS 7565 (July 16, 1986) (finding that a subcontractor was not a third-party beneficiary of a performance bond).   While the Ohio Supreme Court has not addressed the ability to assign a claim under a performance bond, it has addressed the validity of an assignment of a chose in action under an insurance policy that contained an anti-assignment provision.  In *Pilkington North America, Inc. v. Travelers Casualty & Surety Co.*, 112 Ohio St. 3d 482 (2006), a successor corporation brought an action against insurers that issued liability policies to its predecessor corporation, claiming that the insurers owed it duties of defense and indemnity for the underlying environmental claims arising from the predecessor corporation's manufacturing operations.  *Id.* at 483.  Two of the questions certified to the Ohio Supreme Court by the United States District Court were: (1) whether the demand by the successor corporation for defense and indemnification constituted a chose in action, as that term is defined under Ohio law, and (2) whether the insurance policies' anti-assignment clauses barred acquisition by the successor corporation of such chose in action.  *Id.*  at 483.

The Ohio Supreme Court answered the first question affirmatively, recognizing that the term "chose in action" applies to "a right of action for money arising under contract" and that an insured's right to recover, and thus, a chose of action, arises at the time of the covered loss.  *Id.* at 485-86.  It then considered whether that right was properly transferred.  The Court noted the long-standing common law tradition that all contract rights may be assigned unless one of the following three conditions exist: (1) if there is clear contractual language prohibiting assignment; (2) if an assignment materially changes the duty of the obligor, materially increases the insurer's burden or risk under the contract, materially impairs the insurer's chance of securing a return on performance, or materially reduces the contract's value; and (3) if the assignment is  forbidden by statute or by public policy.  *Id.* at 488-89 (citing Restatement (Second) Contracts § 317(2) (1981)).  The court noted the contractual provision prohibiting the assignment of any interest under the insurance policy and the important role of such a provision:

> Risk characteristics of the insured determine whether the insurer will provide coverage, and at what rate. An assignment could alter drastically the insurer's exposure depending on the nature of the new insured. 'No assignment' clauses protect against any such unforeseen increase in risk."

*Id.* at 489.  It further noted, however, that "[i]nsurance policies are generally construed such that assignment of an interest is valid after the occurrence of the loss insured against, and the assignment is then regarded as a transfer of the chose in action, even in the face of an anti-assignment provision."  *Id.*  Because the duty to indemnify implicated losses for property damage and bodily injury that were fixed at the time of the

8

occurrence, the Court found no reason to deviate from this standard rule and held that the chose in action as to the duty to indemnify was unaffected by the anti-assignment provision since the covered loss had already occurred. *Id.* at 490.

A similar approach has been adopted with respect to surety bonds in the Restatement of Law of Suretyship and Guaranty. The Restatement provides:

(1)  The rights of the obligee against the secondary obligor arising out of the secondary obligation can be assigned unless:

(a) the substitution of a right of the assignee for the right of the obligee would materially change the duty of the secondary obligor or materially increase the burden or risk imposed on it by its contract; or

(b) the assignment is forbidden by statute or is otherwise ineffective as a matter of public policy; or

(c) the assignment is validly precluded by contract.
. . . .
(4)  Neither subsection (1) nor a contractual provision that purports to preclude or limit the assignment of an interest in the obligee's rights against the secondary obligor arising out of the secondary obligation:
. . . .
(b) precludes an assignment of a right to damages for breach of the whole secondary obligation or a right arising out of the obligee's due performance of its entire obligation or requires the secondary obligor's consent to such assignment.

Restatement (Third) of Suretyship and Guaranty § 13 (1996). The Restatement applies the reasoning that "[t]he policies supporting contractual freedom to limit assignment do not apply when the obligee is assigning only a cause of action and does not itself owe performance of any duties." *Id.*, cmt. e; *see Balfour, Guthrie & Co. v. Clifford L. Hansen*, 227 Cal App. 2d 173 (1964) (finding that a provision that "no right of action shall accrue under this bond to or for the use of any person other than the said Obligee" did not prevent assignment of a cause of action that had already accrued under the policy).

Nevertheless, citing *Augusta Court Co-Owners Association v. Levin, Roth & Kasner, P.C.*, 971 S.W.2d 119 (Tex. App. 1998); *TRST Atlanta, Inc. v. 1815 The Exchange, Inc.*, 469 S.E.2d 184 (Ga. App. 1996); and  *Southern Patrician Associates v. International Fidelity Insurance Company,* 381 S.E.2d 98 (Ga. App. 1989), OFIC contends that courts have consistently interpreted performance bonds with identical language as that in the Performance Bond in this case as precluding assignment of an obligee's right of action against a surety.

In *Southern Patrician Associates*, the owner of a construction project ("Southern") contracted with

a general contractor ("CM").  Their contract required CM to obtain a performance bond.  CM subcontracted with another entity ("R & M"), which contract required R & M to obtain a performance bond naming CM as obligee.  *Southern Patrician Assoc.*, 381 S.E.2d at 98.  Before completing work under the general contract, CM filed bankruptcy and its surety undertook CM's rights and obligations under the contract and assigned all such rights to Southern.  *Id.*  Some time after such assignment, Southern terminated the contract with R & M for nonperformance and looked to R & M's surety ("IFIC") to ensure completion.  When IFIC failed to respond, Southern completed the work and commenced arbitration against IFIC.  IFIC argued that it was not required to arbitrate, asserting that Southern, as a mere assignee, had no right of action under the terms of the performance bond, which stated that no right of action accrued under the bond except for the use of the obligee or "the heirs, executors, administrators, or successors of the [o]bligee."  *Id.*  By contrast, the general obligation clause of the bond bound the original parties, "their heirs, executors, administrators, successors and assigns."  *Id.*  The court agreed, distinguishing the terms "successors" and "assigns" and finding that the performance bond unambiguously excluded assigns of the obligee from a right of action.  *Id.* at 99.

   *Southern Patrician Associates* is distinguishable from this case in that the assignment of rights occurred before Southern terminated the contract for nonperformance and before the surety was called upon to perform under the provisions of the bond.  Thus, the assignment occurred before any right of action accrued against the surety.  By contrast, in this case, the assignment to PEA occurred after GOE terminated the Construction Contract and, as alleged by GOE in the complaint, after it complied with all of the conditions precedent to OFIC's duty to perform under the bond.  Thus, GOE's right of action against OFIC had already accrued at the time of the assignment to PEA.

   In *TRST Atlanta, Inc.*, a performance bond had been executed between the general contractor and surety in favor of the owner of the construction project.  *TRST Atlanta, Inc.*, 469 S.E.2d at 184.  The plaintiff ("TRST") argued that it was a successor in interest to the owner  with respect to the construction contract and performance bond.  *Id.*  Interpreting language in the bond identical to that in *Southern Patrician Associates*, the trial court concluded that TRST was only an assignee of the owner and, as such, was not authorized to recover on the performance bond.  *Id.* at 185.  The Georgia appellate court affirmed, stating that "the words 'successors' and 'assigns' have different meanings and citing *Southern Patrician Associates* as applicable and binding precedent.  *Id.* at 186.  This court, however, does not find *TRST Atlanta, Inc.*, particularly helpful due to its reliance on *Southern Patrician Associates*, which is distinguishable on its facts, and because there is no indication in the opinion as to when the assignment of rights occurred - i.e.

before or after accrual of a right of action against the surety.

Finally, in *Augusta Court Co-Owners' Association*, the court also interpreted a right of action provision identical to that in *Southern Patrician Associates*. A condominium homeowners association sued its law firm for malpractice, alleging a failure of the firm to timely sue the performance bond surety. The law firm argued that, as a mere assignee of the owner, the association had no right of action against the surety. *Augusta Court Co-Owners' Association*, 971 S.W.2d at 123. The Texas appellate court agreed. The court found persuasive the decisions in the two Georgia cases discussed above and an Illinois case, *Young v. General Insurance Company of America*, 337 N.E.2d 739, 742-43 (Ill. App. 1974), each of which distinguished between the terms "assigns" and "successors" in concluding that an assignee of the obligee had no right of action under the performance bond at issue. *Augusta Court Co-Owners' Association*, 971 S.W.2d at 124. The court concluded that the parties to the performance bond did not intend for the assigns of the construction project owner to have a right of action on the bond. *Id.* at 124-25. However, there is no discussion regarding the effect of an assignment after accrual of a right of action by the obligee against the surety.

Notwithstanding OFIC's argument, this court believes that the Ohio Supreme Court would apply the reasoning set forth in *Pilkington North America, Inc.,* and the Restatement of Law of Suretyship and Guaranty and find that the Construction Claims in this case were validly assigned to PEA. The court recognizes that the provision restricting a right of action under the bond has an important purpose in a performance bond. As one commentator explains, performance bonds typically disclaim the rights of assignees of the named obligee to enforce the bonds without the consent of the obligor for the reason that "the named obligee's identity, financial solvency, project management capability, and capacity to perform the obligee's contractual obligations can be material to the contractor's decision to enter into the bonded contract and to the surety's decision to provide a performance bond." 4A Bruner & O'Connor Construction Law § 12:27.

These concerns do not apply, however, where, as is alleged in this case, the construction contract has been terminated and the obligee has taken all steps required for a duty to arise in the surety to perform under the terms of the bond. After such right of action accrues, the right of action is personal property of the obligee that may be assigned. *Olive Branch Holdings, LLC v. Smith Tech. Dev., LLC*, 181 Ohio App. 3d 479, 494 (2009) (stating that "a chose in action is, itself, personal property"); *Langhals v. Holt Roofing Co.*, 47 Ohio App. 3d 114, 116 (1988) (citing 6A Corpus Juris Secundum 641, Assignments, § 36 (1975)) (stating that a "right of action arising out of contract may be assigned"). The plain language of the bond

11

provision at issue does not require a different result. Unlike the anti-assignment clause in *Pilkington North America, Inc.* that expressly prohibited assignment of any interest in the insurance policies, the provision OFIC interprets as an "anti-assignment" clause simply provides that "[n]o right of action *shall accrue* on the Bond" to any person other than GOE or its "heirs, executors, administrators or successors." Where, as alleged here, the right of action had already accrued to GOE, the assignment to PEA thereafter does not violate this provision.

**2. Claims Under the Construction Contract**

OFIC also argues that PEA has no interest in this proceeding because the Construction Contract prohibits the assignment of GOE's claim against Smith-Boughan, which claim is the basis for recovery against OFIC under the Performance Bond. In support of its argument, OFIC relies on the following provisions in the Construction Contract:

> **§ 13.2.1** Contractor shall not assign . . . any of its rights, interests and benefits under this Agreement without the prior written consent of Owner and (i) any entity or entities providing debt financing to Owner or its Affiliates in connection with the construction and operation of the Project (the "Lenders"), and (ii) any trust or agent acting on behalf of such Lenders (the "Collateral Agent") (the Lenders and Collateral Agent being sometimes referred to . . . as the "Financing Parties"). Owner may pursuant to the terms of a security agreement . . . assign . . . all or any of its rights, interests and benefits under this Agreement to the Financing Parties in order to secure payment of any indebtedness incurred or to be incurred by Owner or its Affiliates in connection and operation of the Project. Contractor hereby expressly authorizes the Financing Parties . . . , as a secured party, to exercise all rights of Owner under this Agreement and to subsequently assign such rights in connection therewith. . . . .
>
> **§ 13.2.2.** This Agreement shall be binding upon and shall inure to the benefit of, the successors and permitted assigns of Contractor and the Owner. This Agreement shall inure to the benefit of the Financing Parties . . . and any subsequent transferee or assignee thereof. Any assignment in violation of this Section 14.4.4 (sic) shall be void.

[Doc. # 1, Ex. A]. Because PEA is not a "Financing Party," OFIC contends that it is not a "permitted" assign such that GOE's assignment of its Construction Claims to PEA is void as being in violation of § 13 of the Construction Contract.

However, GOE did not assign any rights that it still had under the Construction Contract. The Construction Contract had been terminated. What GOE assigned was its right of action for damages resulting from Smith-Boughan's alleged breach of the Construction Contract. Such assignment does not violate § 13 of the Contract. *See* Restatement (Second) Contract § 322(2)(a) (providing that "[a] contract term prohibiting assignment of rights under the contract, unless a different intention is manifested, (a) does not forbid assignment of a right to damages for breach of the whole contract. . . .").

12

Moreover, as discussed earlier, language in a contract prohibiting the assignment of contract rights must be clear. *Pilkington North Am., Inc.*, 112 Ohio St.3d at 488. Provisions that GOE may assign its rights under the Contract to the Financing Parties and that Smith-Boughan expressly authorizes the Financing Parties to exercise and assign such rights, without more, do not constitute clear and plain language prohibiting assignment to any other party as is required to render a contract non-assignable.

Because the Construction Claims have been property assigned to PEA, the court concludes that PEA has a substantial legal interest in the subject matter of this proceeding.

## III. Other *Blount-Hill* Factors Support Intervention

The third and fourth *Blount-Hill* factors - the applicant's ability to protect its interest will be impaired without intervention and the existing parties will not adequately represent the applicant's interest – also support PEA's intervention in this case. Although a proceeding may be continued by the original party where, as in this case, its interest is transferred after the complaint is filed, *see* Fed. R. Civ. P. 25(c); Fed. R. Bankr. P. 7025, GOE has taken no steps to prosecute the case since the assignment. It is no longer a functioning entity and has no interest in prosecuting this adversary proceeding. OFIC has asked this court for relief from the court's order staying this proceeding pending arbitration in order to file a motion for partial summary judgment. Absent PEA's intervention, there is no party whose interest is aligned with that of PEA. As such, there is no party that will represent PEA's interest in prosecuting the claim against OFIC or in defending against OFIC's motion.

For all of the foregoing reasons, the court finds that PEA's intervention in this proceeding is proper under Federal Rule of Civil Procedure 24(a)(2).

**THEREFORE**, for the foregoing reasons, good cause appearing,

**IT IS ORDERED** that PEA (LIT), LLC's Motion to Intervene as an Interested Party [Doc. # 106] be, and hereby is, **GRANTED.**

13